UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

In re:

Fredrick R. Bohjanen and
Lorna M. Bohjanen,

        Debtors.
_____/

Kip Kaler, as Bankruptcy Trustee,

        Plaintiff,

  vs.

Harwood State Bank,

        Defendant.
_____/

Bankruptcy No. 05-31337
Chapter 7

Adversary No. 05-07055

## MEMORANDUM AND ORDER

By Complaint filed December 6, 2005, the Chapter 7 trustee, Kip Kaler, filed this adversary proceeding seeking to recover $2,230.00, which he alleges was a preferential transfer to Defendant Harwood State Bank pursuant to 11 U.S.C. § 547. Harwood State Bank filed its Answer on December 30, 2005, claiming that any transfer of Debtors' property was done in the ordinary course of business or financial affairs of both Debtors and Harwood State Bank. The matter was tried on April 11, 2006. Gene Doeling represented the Chapter 7 trustee and Joseph Turman and Katrina Turman represented Harwood State Bank. The following constitutes the Court's Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

Debtors Fredrick and Lorna Bohjanen have been customers of Harwood State Bank

("HSB") for the last seven years. Debtors hold two types of accounts at the bank: a savings account and various types of loan accounts.

In 2003, Debtors began obtaining tax refund loans from HSB. Although not completely developed at trial, the process appeared to be as follows: Debtors would have their tax return prepared by an accountant; they would then bring their completed tax forms to HSB for review; after review Debtors would receive a loan based on their anticipated refund. Each year, Debtors signed an agreement with the Internal Revenue Service that allowed the IRS to directly deposit Debtors' tax refund into their savings account at HSB. Mr. Bohjanen had what he termed a "gentlemen's agreement" with Doug Mattson, a loan officer with HSB. They agreed that once the tax refund was deposited into Debtors' account, HSB would contact Mr. Bohjanen to let him know the money had arrived. Mr. Bohjanen would then give verbal authorization for HSB to withdraw an amount from his savings account that would repay his tax refund loan in full. Mr. Bohjanen acknowledged that this was only an agreement based on a hand-shake and was not necessarily the official practice of HSB.

The first time Debtors took out a tax refund loan, HSB required that it be cross-collateralized. Therefore, in 2003, Debtors gave HSB security interests in their 1977 Invader Gooseneck trailer, a 1988 F250 Ford truck, and a 1974 Ford truck. Thereafter, HSB did not require Debtors to provide security for their tax refund loans nor did Debtors provide HSB with any assignments.

Tom Stennes, President of HSB, testified that HSB's dealings with Debtors were consistent with HSB's ordinary course of business. The first time a customer sought a tax refund loan, HSB required that the loan be cross-collateralized. Once HSB became familiar with the

2

customer and felt secure that the customer would repay the loan, it no longer required collateral on tax refund loans. Mr. Stennes testified that HSB did not feel collateral was needed on these types of loans because the refund would be directly deposited into the customer's account, and HSB had a right to setoff in the loan agreement.

In 2003, 2004 and 2005, Debtors signed a Promissory Note each time they received a tax refund loan. Each Note contained almost identical language. Particularly relevant to this proceeding are two sections contained in each note. The first section is entitled "Default" and states that a lendee will be in default under the Note if, in good faith, HSB believes it is in an insecure position. The second relevant section is entitled "Right of Setoff." This section states:

> To the extent permitted by applicable law, Lender reserves a right
> of setoff on all my accounts with Lender (whether checking,
> savings, or some other account). This includes all accounts I hold
> jointly with someone else and all accounts I may open in the
> future. However, this does not include any IRA or Keogh
> accounts; or any trust accounts for which setoff would be
> prohibited by law. I authorize Lender, to the extent permitted by
> applicable law, to charge or setoff all sums owing on the debt
> against any and all such accounts.

Debtors' refund was deposited into their savings account by the IRS on April 22, 2005. Unlike their 2003 and 2004 refunds, Debtors' 2005 refund was insufficient to repay their entire tax refund loan (principal plus interest). Debtors' 2005 refund was $2,224.00 and they owed $2,600.44 ($2,550.00 in principal and $50.44 in interest). On May 2, 2005, Matt Mueller, a loan officer with HSB, wrote Mr. Bohjanen and notified him that HSB had withdrawn $2,230.00 from account No. XXXXX78 to repay part of the tax refund loan, and that there remained an unpaid balance of $370.44.

Mr. Bohjanen testified that he was surprised when he received Mr. Mueller's letter. He

3

testified that he had neither received notice that his tax refund had been deposited into his account nor had he authorized HSB to withdraw the money to repay the loan, as had been done in the prior two years. He also knew that the loan did not mature until May 15, 2005.

Mr. Stennes testified that when the tax refund came back and was not enough to repay the entire amount of the loan, HSB in good faith believed itself to be in an insecure position. Based on the Note signed by Mr. Bohjanen, HSB considered Debtors to be in default, and HSB exercised its right to setoff under the Note.

On May 6, 2005, Mr. Bohjanen entered into a Change of Terms Agreement with HSB which extended the repayment period for the remaining $370.44 from May 15, 2005 until August 13, 2005.

Debtors filed for Chapter 7 bankruptcy relief on June 30, 2005. The parties are in agreement regarding three essential facts in this matter: 1) HSB's transfer of funds from Debtors' savings account in repayment of the 2005 tax refund loan was done within 90 days of Debtors' bankruptcy filing; 2) Debtors did not give HSB any security interest or assignment regarding the 2005 tax refund loan; and 3) during the period of time that the tax refund loan was outstanding, Debtors had full access to their savings account with all rights reserved.

## CONCLUSIONS OF LAW[1]

In enacting 11 U.S.C. § 547(b), Congress gave bankruptcy trustees broad authority to avoid preferential transfers. Union Bank v. Wolas, 502 U.S. 151, 154 (1991). To avoid a transfer as preferential, the trustee must show that: 1) the transfer was made on or within 90 days

---

[1] Debtors' bankruptcy was filed prior to October 17, 2005, the date that the amendments of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 went into effect. Therefore, the law applied by the Court is that which was in effect at the time of the filing.

of the date of the filing of the bankruptcy petition; 2) the debtor was insolvent when the transfer was made; 3) the transfer was made on account of an antecedent debt; and 4) the transfer enabled the creditor to receive more than it would have received had: a) the transfer not been made; or b) such creditor received payment of the debt under the provisions of the bankruptcy code. 11 U.S.C. § 547(b); In re Vatnsdal (Drewes v. Vatnsdal), 139 B.R. 472 (Bankr. N.D. 1991). The trustee has the burden of establishing each of the elements by a preponderance of the evidence. In re Bridge Information Systems, Inc., 311 B.R. 774, 778 (Bankr. E.D. Mo. 2004).

      The trustee readily proved three of the elements of a preferential transfer by a preponderance of the evidence during trial. The transfer at issue was made on May 2, 2005, and Debtors filed for bankruptcy on June 30, 2005. Clearly, this transfer was made within 90 days of the date of the bankruptcy petition filing. Next, Debtors were insolvent when this transfer was made. Under section 547(f), debtor is presumed to be insolvent on and during the 90 days immediately preceding the bankruptcy filing. 11 U.S.C. § 547(f). No evidence was produced to rebut this presumption. Lastly, the transfer was made to pay off an antecedent debt of Debtors.

      The final element, that HSB received more than it would have had this transfer not been made, or that HSB received more than it would have under the provisions of the Bankruptcy Code, has not been met. When Debtors' bankruptcy petition was filed, their case appeared to be a no-asset case in which unsecured creditors, like HSB, would receive nothing on their claims. In this scenario, the fourth element of a preferential transfer would have been met because instead of receiving nothing under the Bankruptcy Code, HSB received $2,230.00. The trustee, however, recently requested that the bankruptcy clerk's office issue a notice to creditors to file claims. This notice was sent to creditors on February 14, 2006, and creditors have until May 19,

5

2006 to file their claims. Apparently, since his initial determination at the time of the filing that this was a no-asset case, the trustee has discovered assets of Debtors that will enable him to make some payment to unsecured creditors. During trial, though, the trustee provided no evidence as to the total amount of the assets recovered, total claims submitted thus far, or what payment to unsecured creditors was likely. Therefore, it would be speculative for the Court to determine at this juncture that HSB received more from the transfer at issue than it would have otherwise, and the trustee failed to meet his burden as to this element.

Moreover, even if the trustee had proven the fourth element by a preponderance of the evidence, HSB would prevail because the transfer was made in the ordinary course of business or financial affairs and under ordinary business terms between Debtors and HSB.

If a transfer is deemed to be preferential, a trustee cannot avoid it if the transfer was made in the ordinary course of business of a debtor and the transferee. 11 U.S.C. § 547(c)(2). The intent of the ordinary course of business exception is for normal financial transactions to be allowed because they do not detract from the general policy of the preference section, which is to discourage unusual actions by debtors or creditors while the debtor is sliding into bankruptcy. Union Bank, 502 U.S. at 532.

To prevent avoidance of the transfer, the transferee must prove that the transfer was: 1) in payment of a debt incurred by the debtor during the ordinary course of business between the debtor and the transferee; 2) made in the ordinary course of business of the debtor and transferee; and 3) made according to ordinary business terms. 11 U.S.C. § 547(c)(2); In re Vatnsdal, 139 B.R. at 475; In re Gateway Pacific Corp. (Official Plan Comm. v. Expeditors Int'l of

Washington, Inc.), 153 F.3d 915, 917 (8th Cir. 1998). The transferee must prove each element by a preponderance of the evidence. In re Gateway, 153 F.3d at 917.

There is no precise legal test to determine if a transfer was made in the ordinary course of business. Id. Instead, the court must engage in "a peculiarly factual analysis." Id. The cornerstone element of the defense is that the creditor must "demonstrate some consistency with other transactions between the debtor and creditor." Lovett v. St. Johnsbury Trucking, 931 F.2d 494, 497 (8th Cir. 1991).

The transaction between Debtors and HSB was done in the ordinary course of business. First, Debtors incurred this debt during the ordinary course of business between them and HSB. Since 2003, Debtors had taken out a tax refund loan with HSB. Each year, after Debtors had their income taxes done, they gave HSB their completed return, and they took out a loan which could be paid off in full (principal and interest) with their tax refund. Debtors' and HSB's actions in 2005 were consistent with what occurred between them in 2003 and 2004.

Second, the transfer to repay the loan was made within the ordinary course of business of Debtors and HSB. In order to receive a tax refund loan in 2003, 2004 and 2005, Mr. Bohjanen signed a Promissory Note with HSB. Each of these Notes contained language giving HSB a right to setoff in all of Debtors' accounts if and when HSB felt insecure. Each year previous to 2005, Debtors' return covered the entire amount of the loan. HSB had no reason to believe 2005 would be different, and Mr. Bohjanen testified that when he took out the loan, he too believed his return would be enough to repay it.

Although Mr. Bohjanen testified that he was surprised he had not been told of the transfer until after it was completed, this fact alone does not prove that the transfer was outside the

7

ordinary course of business of the parties involved. As stated above, each Note signed by Debtors allowed for setoff. HSB had no reason to exercise its right to setoff in 2003 or 2004, because the returns were sufficient to repay the tax refund loan. Mr. Stennes testified that once Debtors' 2005 tax refund came back and did not cover the entire amount of the loan, HSB's position was insecure. This was the first time the issue arose between Debtors and HSB, and HSB acted accordingly. HSB's determination to assert its right of setoff because of its insecurity was made in good faith, was reasonable, and was consistent with the terms of the 2003, 2004 and 2005 Notes.

Lastly, this transfer was made according to ordinary business terms. Robert Entringer, Assistant Commissioner of the North Dakota Department of Financial Institutions, testified that it is customary in North Dakota for banking institutions to issue tax refund loans. Based upon all the information he reviewed in this case, Mr. Entringer opined that HSB followed customary banking policies when issuing this loan to Debtors and that the loan was made in the ordinary course of business and according to ordinary business terms. In his expert opinion, which was not controverted, it was not an extraordinary measure for HSB to setoff this loan prior to its maturation date since the tax refund was directly deposited into Debtors' general savings account, and HSB was in an insecure position.

The Court's decision in this matter is consistent with established case law within the Eighth Circuit. In In re PRS Products, Inc., the Eighth Circuit affirmed the ruling of this Court and the North Dakota District Court. In re PRS Products, Inc., 574 F.2d 414 (8th Cir. 1978). In its opinion, the Eighth Circuit stated, "Ordinarily, no voidable preference is created when a bank sets off funds in a general deposit account against a debt owed to the bank by the depositor. The

bank's set-off exception, however, only applies to deposits made in good faith, made in the due course of business, and subject to withdrawal at the will of the depositor." In re PRS Products, Inc. (Herzog v. Mandan Security Bank), 574 F.2d 414, 418 (8th Cir. 1978).  This deposit of Debtors' tax refund by the IRS into Debtors' savings account in 2005, the same way it was done in 2003 and 2004, was done in good faith, was done in the due course of business and based upon the testimony of Mr. Stennes and Mr. Bohjanen, Debtors had the right to withdraw funds as they saw fit.  Hence, the transfer was done according to ordinary business terms.

The trustee has failed to prove by a preponderance of the evidence that the transfer of Debtors' tax refund from Debtors' savings account to HSB to cover the outstanding balance on Debtors' tax refund loan was a preferential transfer.  Even if the trustee had proven that the transfer was preferential, HSB has met its burden of proving that the transfer was done within the ordinary course of business and within ordinary business terms.  HSB can retain the $2,230.00 which it transferred from Debtors' savings account.

**SO ORDERED.**

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

Dated this 25th Day of April, 2006

                      WILLIAM A. HILL, JUDGE
                      U.S. BANKRUPTCY COURT